641 P.2d 1222 (1982)
A, Appellant (Plaintiff),
v.
X, Y, AND Z, Appellees (Defendants).
No. C-4.
Supreme Court of Wyoming.
March 8, 1982.
John M. Daly, of Daly, Maycock, Anderson & Taylor, Gillette, for appellant.
Francis E. Stevens, of Sheehan, Stevens & Sansonetti, Gillette, for appellees.
Dan R. Price, II, of Morgan & Brorby, Guardian Ad Litem, Gillette, for appellee, Minor Child X.
Before ROSE, C.J., and RAPER, THOMAS, ROONEY and BROWN, JJ.
ROONEY, Justice.
Appellant-plaintiff (hereinafter referred to as A) brought this action to establish his paternity to appellee-defendant X (hereinafter referred to as child). In early November 1979, A and appellee-defendant Y (hereinafter referred to as mother) engaged in sexual intercourse. On February 8, 1980, mother and appellee-defendant Z (hereinafter referred to as Z) were married. On August 3, 1980, mother gave birth to child. The trial court held that A lacked standing to bring this action. A appeals from the order dismissing his amended complaint with prejudice. A guardian ad litem was appointed for the child.
We affirm.
A alleged in his amended complaint that he is the biological father of child; that Z is the presumptive father of child; that child will have needs; that A has financial means to provide for child's needs; and that he desires to do so. Such allegations are taken to be true for the purposes of this action. In his prayer, A requests that he be declared the father of child; that child's birth records be changed to strike Z's name therefrom and to reflect A as child's father; and that A be given visitation rights and an obligation to support child.

I
At common law, a biological father could not bring an action for paternity. Blanton v. Warn, Wyo., 444 P.2d 325 (1968). He has only those rights conferred by statute. In recognition of such, A recited that this action was brought pursuant to §§ 14-2-101 through 14-2-120, W.S. 1977. Section 14-2-104, W.S. 1977, designates those entitled to bring a paternity action. It authorizes such action only in three instances:
"(a) A child, his natural mother or a man presumed to be his father under W.S. 14-2-102(a)(i), (ii) or (iii) may bring action:

*1223 "(i) At any time for the purpose of declaring the existence of the father and child relationship presumed under W.S. 14-2-102(a)(i), (ii) or (iii); or
"(ii) For the purpose of declaring the nonexistence of the father and child relationship presumed under W.S. 14-2-102(a)(i), (ii) or (iii) only if the action is brought within a reasonable time after obtaining knowledge of relevant facts, but in no event later than five (5) years after the child's birth. After the presumption has been rebutted, paternity of the child by another man may be determined in the same action if he has been made a party.
"(b) Any interested party may bring an action at any time for the purpose of determining the existence or nonexistence of the father and child relationship presumed under W.S. 14-2-102(a)(iv).
"(c) An action to determine the existence of the father and child relationship with respect to a child who has no presumed father under W.S. 14-2-102 may be brought by the child, the department of health and social services, the mother or personal representative of the child, the personal representative or a parent of the mother if the mother has died or is a minor, a man alleged or alleging himself to be the father, or the personal representative or a parent of the alleged father if the alleged father has died or is a minor."
A cannot qualify to bring the action under any of the three instances. He is not a presumed father under § 14-2-102(a)(i)(ii) or (iii), W.S. 1977, inasmuch as he was not married to the mother when the child was born; there was no attempted marriage between A and mother before the child's birth which "is or could be declared invalid"; and there was no attempted marriage between A and mother after the child's birth which "is or could be declared invalid." There is not here a presumed relationship under § 14-2-102(a)(iv) inasmuch as such refers to a presumption arising if A receives the minor child into his home and openly holds out the child as his natural child. And, finally, subsection (c), § 14-2-104, is inapplicable since there is a presumed father and child relationship under § 14-2-102, between Z and child by virtue of the fact that Z was married to mother at the time of child's birth. Section 14-2-102 provides in pertinent part:
"(a) A man is presumed to be the natural father of a child if:
"(i) He and the child's natural mother are or have been married to each other and the child is born during the marriage * * *.
* * * * * *
"(b) A presumption under this section may be rebutted in an appropriate action only by clear and convincing evidence. * * *"
It would seem, then, that the issue is settled and that A lacked standing to maintain this action. However, A contends that such construction unconstitutionally deprives him of due process of law and denies to him equal protection of the law[1] by virtue of an impermissible gender-based classification which results from failure to give the biological father the same procedure to establish paternity or nonpaternity as is given to the mother.
He does not suggest that such should make the entire enactment (§ 14-2-101, W.S. 1977 et seq.) unconstitutional, and, thus, leave the matter as it would be under common law. Rather, he argues that legislative intent was to enact a constitutional law and that we should give recognition to such intent by construing the act in a manner whereby A would have standing to *1224 maintain the action. See Sanches v. Sanches, Wyo., 626 P.2d 61 (1981).[2]

II
A is not denied equal protection of the law. Gender-based classifications are not ipso facto invalid.
"As is evident from our opinions, the Court has had some difficulty in agreeing upon the proper approach and analysis in cases involving challenges to gender-based classifications. The issues posed by such challenges range from issues of standing, see Orr v. Orr, 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979), to the appropriate standard of judicial review for the substantive classification. Unlike the California Supreme Court, we have not held that gender-based classifications are `inherently suspect' and thus we do not apply so-called `strict scrutiny' to those classifications. See Stanton v. Stanton, 421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975). Our cases have held, however, that the traditional minimum rationality test takes on a somewhat `sharper focus' when gender-based classifications are challenged. See Craig v. Boren, 429 U.S. 190, 210 n.[*], 97 S.Ct. 451, 464, 50 L.Ed.2d 397 (1976) (POWELL, J., concurring). In Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), for example, the Court stated that a gender-based classification will be upheld if it bears a `fair and substantial relationship' to legitimate state ends, while in Craig v. Boren, supra, 429 U.S. at 197, 97 S.Ct. at 457, the Court restated the test to require the classification to bear a `substantial relationship' to `important governmental objectives.'
"Underlying these decisions is the principle that a legislature may not `make overbroad generalizations based on sex which are entirely unrelated to any differences between men and women or which demean the ability or social status of the affected class.' Parham v. Hughes, 441 U.S. 347, 354, 99 S.Ct. 1742, 60 L.Ed.2d 269 (1979) (STEWART, J., plurality). But because the Equal Protection Clause does not `demand that a statute necessarily apply equally to all persons' or require `things which are different in fact ... to be treated in law as though they were the same,' Rinaldi v. Yeager, 384 U.S. 305, 309, 86 S.Ct. 1497, 1499, 16 L.Ed.2d 577 (1966), quoting Tigner v. Texas, 310 U.S. 141, 147, 60 S.Ct. 879, 882, 84 L.Ed. 1124 (1940), this Court has consistently upheld statutes where the gender classification is not invidious, but rather realistically reflects the fact that the sexes are not similarly situated in certain circumstances. Parham v. Hughes, supra; Califano v. Webster, 430 U.S. 313, 97 S.Ct. 1192, 51 L.Ed.2d 360 (1977); Schlesinger v. Ballard, 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975); Kahn v. Shevin, 416 U.S. 351, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1974). As the Court has stated, a legislature may `provide for the special problems of women.' Weinberger v. *1225 Wiesenfeld, 420 U.S. 636, 653, 95 S.Ct. 1225, 1236, 43 L.Ed.2d 514 (1975)." Michael M. v. Superior Court of Sonoma County, 450 U.S. 464, 468, 101 S.Ct. 1200, 1204, 67 L.Ed.2d 437 (1981).
The classification here made is not "entirely unrelated to any differences between men and women." The differences are the very foundation of the classification. Here, they are obvious. The woman carries the child through pregnancy. When born of her, the fact of motherhood is obvious. Not so the man. The proof of fatherhood, or the proof of the lack thereof, must come from an external source. The entire classification within the act (§ 14-2-101, W.S. 1977 et seq.) is premised on this basic and obvious distinction, it is not invidious, but "realistically reflects the fact that the sexes are not similarly situated" in the circumstances. Men do not bear children and give birth to them.
Furthermore, to word the enactment without gender classification would result as a purpose for the enactment to be a determination of the existence or nonexistence of a presumed mother in addition to that of a presumed father. Such result would be an absurdity. Nature identifies the mother at the time of birth. There is no need to engage in presumptions.
As reflected in its opinion letter, the trial court properly found that:
"* * * the State has an interest in protecting and preserving the integrity of the family unit. See also, Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042, 1045 (1923). It also has an interest in protecting the best interests of the child. Even in this era of no-fault divorce, frequent premarital sex and cohabitation and new attitudes toward child rearing, a child has a right to legitimacy and that right is one the State is bound to protect during minority. Rule 17(c), W.R.C.P. See also, In the Matter of Parental Rights to Child X, * * * [Wyo., 617 P.2d 1078 (1980)]."
And see DS v. Department of Public Assistance and Social Services, Wyo., 607 P.2d 911 (1980).
The trial court continued its proper analysis as follows:
"The statute is a legimate [sic] attempt by the legislature to protect the family unit and the children from external forces. A suit by one outside the marriage, such as in this case, could well destroy a marriage. * * * [Appellant] is concerned that the mother (actually those within the family unit  the child, the mother, and the presumed father) can bring a parentage action which would have the same deleterous [sic] affect on the marriage as would a suit by an outsider. But, the members of the family, not the outsider, are in the best position to judge whether the marriage can stand the trauma or has already failed. Recognizing the same kind of practical test, the U.S. Supreme Court has held that the spousal testimony privilege may be invoked by the spouse called to testify but not by the spouse against whom the testimony is offered (except for `pillow talk'). Trammel v. United States, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980).
"It could be argued that under our statute a biological father is prevented from asserting his parental rights even after the mother and the presumed father have divorced and the family unit which the State seeks to protect has dissolved. Such an argument would ignore the State's interest in protecting the child's claim to legitimacy, which survives a divorce. Also, it would extend equal protection further than the Courts have gone. If the legislative method is rationally related to the State's interest Courts are not called upon to second guess that method or to strike it down because a better method might be devised. Michael M. v. Superior Court of Sonoma County, supra, [450 U.S. 464, 101 S.Ct. 1200, 67 L.Ed.2d 437] * * *."
To recognize A's standing to bring this action would be to invite similar actions by those whose only purpose is to break up a family unit to satisfy a jealous or revengeful feeling.
*1226 Certainly, if A has an interest which is constitutionally recognizable, it does not rise to the level of a fundamental right requiring that the legislative classification preventing nonfamily persons from attacking the presumption that Z is the natural father be tested by the standard of strict scrutiny. But this classification will withstand even the strict scrutiny test. Such scrutiny discloses a very young child born to mother when she was married to Z. A family unit was thus established. The child is legitimatized. The statute does not give authority to a stranger to contest the situation without more. For the same reasons, the classification will certainly stand up under the other standards for determining the propriety of a classification. See Skinner v. State of Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); DS v. Department of Public Assistance and Social Services, supra. The legislative classification is reasonable and bears a fair and substantial relationship to important governmental objectives. It passes a constitutional challenge regardless of the standard by which measured.
It is to be noted that a biological father may assert his interest pursuant to the act (§ 14-2-102) under proper circumstances such as those in which the child has no presumed father, or in which the presumption of paternity results from a man taking the child into his home and holding it out as his own. In Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), and in In Re Lisa R., 13 Cal.3d 636, 119 Cal. Rptr. 475, 532 P.2d 123, 90 A.L.R.3d 1017 (1975), the biological father had standing to maintain an action to assert parental rights after the mother was dead and the custody of the child was in the state. The family-unit interest was not threatened. In Caban v. Mohammed, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979), a statutory provision allowing unwed mothers, but not unwed fathers, the right to object to adoption of the children was held unconstitutional with the state interest being to promote legitimatization of children. A former husband and biological father had sought to prevent the mother's current husband from adopting the children born during the cohabitation of the biological parents. The biological father was so named on the birth certificates and had maintained contacts with the children over the years. Under the Wyoming statute (§ 14-2-102(a)(iv)), he would have had standing as a presumed father to bring a timely paternity action. In the action here before the court, the same interest (to promote legitimacy of children) mitigates to declare the parentage enactment to be constitutional.
Not only may the biological father assert his interest under the act (§ 14-2-102) in designated circumstances, thus negating the assertion that the act is gender based, but authorization is there given to the child (approximately 50 percent of the children would be male) and to the presumed father (100 percent of the fathers would be male) to assert their interests. It is difficult to conclude that the classification is based on gender. The classification is based on a distinction between those within the family unit and those without regardless of gender. It recognizes a difference between instances in which legitimacy and the interests of the child can be protected and those instances where such has already been violated. The nongender-based classification furthers important governmental objectives and has a substantial relationship thereto. If the classification can be said to be gender based, it is not invidious but only realistically reflects the fact that sexes are not similarly situated in these circumstances. And, it is proper under any of the standards applied to it.

III
Nor is A denied due process of the law. Since A had no right to maintain an action for paternity at common law, the enactment (§ 14-2-101, W.S. 1977 et seq.) did not deprive him of any procedural remedy. The plain fact is that the legislature did not establish a private interest in A which would be entitled to protection by legal process. In fact, had such interest and process been provided by the legislature, it could be construed as state action disruptive *1227 of the family. To provide A with a hearing would create the ill which the statutory scheme seeks to avoid. The bringing of such action and the resulting hearing would attack the family unit and the child's legitimacy and well being, and it would cause the harm sought to be avoided, regardless of the outcome of the hearing. Any stranger desiring to injure the mother, the child, or the presumed father, for whatever reason, could inject disruptive elements into the family unit by instituting such action.
"One of the liberties protected by the Due Process Clause, the Court has held, is the freedom to `establish a home and bring up children.' [Citation.] If a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest, I should have little doubt that the State would have intruded impermissibly on `the private realm of family life which the state cannot enter.' * * *" Smith v. Organization of Foster Families for Equality and Reform, 431 U.S. 816, 862, 97 S.Ct. 2094, 2119, 53 L.Ed.2d 14 (1977).
But, assuming arguendo that A had a constitutionally cognizable interest, competing private and state interests would have to be weighed to determine whether a hearing were necessary to afford due process of the law.
"In considering this procedure under the Due Process Clause, we recognize, as we have in other cases, that due process of law does not require a hearing `in every conceivable case of government impairment of private interest.' [Citation.] That case explained that `[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation' and firmly established that `what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.' [Citations.]" Stanley v. Illinois, supra, 92 S.Ct. at 1212.
The government function in this case (a determination that there is no right of action in A so that he could not attack the family unit and the legitimacy and well being of the child) far outweighs the private interest of A. As stated in the trial court's opinion letter:
"I don't believe that a statute which prevents a biological father from bastardizing a child violates due process of law. It appears that the legislature has carefully weighed the various social values and decided that the biological father's rights are subordinate to the collective rights of the child, the mother, the presumed father and the family unit."
Affirmed.
THOMAS, Justice, specially concurring.
I agree with the result of affirmance reached by the majority of the court in this case. I am satisfied, however, that the appellant has no standing to attack the constitutionality of §§ 14-2-101 through 14-2-120, W.S. 1977, and the concept of judicial restraint then demands that neither this court nor the trial court should consider the constitutionality of the statutes.
Appellant concedes, and correctly so, that under common-law principles he had no affirmative right to establish his paternity. Blanton v. Warn, Wyo., 444 P.2d 325 (1968). He brought his action asserting a right to proceed under §§ 14-2-101 through 14-2-120, W.S. 1977. These statutes do not afford appellant any affirmative right to establish his paternity.
The appellant's imaginative argument presents an effort to create a right that does not exist by statute or common law. He argues that since the statutes afford him no right to proceed, the statutes may be subject to constitutional challenge insofar as they affect his rights. Therefore, appellant contends, the statutes must be construed to afford him the affirmative right to proceed with the result being that statutes which do not afford him a right *1228 turn into statutes which do. It is my view that this argument, imaginative as it is, does not afford standing to the appellant.
We have held that a party does not have standing to challenge the constitutionality of a statute unless we can identify the fact and nature of any injury to the party's rights which resulted from the enactment of the statute. Budd v. Bishop, Wyo., 543 P.2d 368 (1975). These statutes had no impact upon any right of the appellant. He therefore cannot challenge in this context the constitutionality of the statutes because he has no standing. In Budd v. Bishop, supra, at 372, we said:
"* * * [W]e note that the judgment and conclusions of law of the district court affirmatively uphold the constitutionality of the Wyoming Surplus Water Law. Because in our view the constitutionality of the statute could not be reached, we believe it is necessary, in order to honor the concept of judicial restraint as to constitutional issues, that this case be remanded for the purpose of deleting the conclusions of law from the judgment, and entering new conclusions of law to the effect that the action is dismissed because Budd does not have standing to raise the constitutional question."
For these reasons I would hold that the trial court correctly dismissed the appellant's action for lack of standing on his part to attack the constitutionality of the statutes, and for that reason this court should refrain from discussing the constitutionality of the statutes.
ROSE, Chief Justice, dissenting.
The plaintiff-appellant putative father seeks to establish a parent-child relationship with a child who was born to the mother while she was married to another man. That the child was conceived through the union of the appellant and the mother before her marriage is not in dispute. It is also undisputed that the biological mother and father were not married when the child was conceived.
A presumption of natural parenthood attaches to the man to whom the mother was married when the child was born. § 14-2-102, W.S. 1977. The putative father seeks to attack and overcome the presumption with proof that he is the natural father  which, it is agreed, he is in fact. The putative father's appeal is spearheaded with the concept that his constitutional rights have been violated in that to enforce the statute against him is to give the mother, presumptive father and the child a right of action against him for purposes of proving a parent-child relationship (or absence of it), while the statute fails to provide him the same right of action. In other words, says the putative father, the statute does not give me a right of action which would allow me to overcome the presumption of natural parenthood in the wife's husband with the resulting assumption of the lawful rights and obligations of parenthood in me. See § 14-2-104, W.S. 1977.
It is argued by the mother, presumptive father and child that this statute is not available to the putative father for these purposes because  in a suit such as this where he seeks to assert the parent-child relationship  the putative father has no standing. The logic of the argument is that a putative father had no standing at common law to upset the family unity with an attack upon the presumption of parenthood which the presumptive father enjoys  the statute gives him no such standing  and thus he has no standing in the case at bar. I understand this to be the position of Justice Thomas as expressed in his separate concurring opinion. It is urged that for these reasons, the putative father's constitutional rights have not been infringed upon.
The opinion of the majority disposes of the appeal on the grounds that the denial of appellant's petition, i.e., his right to attack the presumption of fatherhood in the mother's husband, is bottomed in the fact that the statute which gives only the mother, presumptive father and child a right of action does not violate the putative father's equal-protection and due-process rights as guaranteed by the Federal and State Constitutions. Of course, this manner of resolution *1229 presumes standing while rejecting the alleged constitutional shortcoming. In other words, according to the majority view, the putative father finds himself in a "Catch-22" situation[1] because, while he gets to go to court, he can not win when he gets there, no matter what his legal or factual position might be.
I want to go back and see whether the appellant lacks standing; if he has no standing as Justice Thomas suggests, that ends it and I need not thereafter inquire whether the statute violates equal-protection and due-process concepts.

STANDING
Where does the appellant find such standing as will permit him to assert his parent-child relationship, thereby allowing him to test the presumption of fatherhood in the wife's husband? Or, does the presumption  so far as the appellant is concerned  stand irrebuttable because the law does not give him access to the courts for the purpose of lodging an attack against it?
Preliminarily, I would observe that a putative father has standing to assert paternity if there is no presumptive father. Section 14-2-104(c), W.S. 1977 provides:
"An action to determine the existence of the father and child relationship with respect to a child who has no presumed father under W.S. 14-2-102 may be brought by the child, the department of health and social services, the mother or personal representative of the child, the personal representative or a parent of the mother if the mother has died or is a minor, a man alleged or alleging himself to be the father, or the personal representative or a parent of the alleged father if the alleged father has died or is a minor." (Emphasis added.)
Likewise a man whose position is that he is not the father could utilize the constitutional defenses upon which the appellant relies here as an affirmative response (equal protection and due process) should he find himself a defendant in an action where either the mother, presumed father or the child were attempting to establish his paternity through the utilization of § 14-2-104, W.S. 1977. But that is not the case here. In this case the appellant-biological father attacks a statute which denies him the right to assert his parental rights by urging equal-protection and due-process violations which arise out of the wording of the statute and the manner that it has, under these particular facts, been applied to his detriment.
When confronted with the standing defense, he argues that he has a fundamental right in the natural father-child relationship which is assertable against the presumption of fatherhood in the mother's husband. I would agree that he does have such standing because he does have the right which he asserts. See DS v. Dept. of Public Assistance and Social Services, Wyo., 607 P.2d 911 (1980), discussed herein, infra. See also the recent 10th circuit decision in Blair v. Supreme Court of the State of Wyoming, 671 F.2d 389, (1982), where Circuit Judge Seymour, speaking for the court, said:
"We recently recognized in Wise v. Bravo, 666 F.2d 1328, 1331 [80-1494, slip op. at 5] (10th Cir., 1981), that the relationship between parent and child is constitutionally protected." Slip opinion at p. 2.
While the statutes do not give the putative father a right of action to assert parenthood, they do identify him as having a legal "parent and child relationship" with his offspring, and they make no exception *1230 to this relationship where the child has a presumptive father. Section 14-2-101, W.S. 1977 provides in relevant part:
"(a) As used in W.S. 14-2-101 through 14-2-120, `parent and child relationship' means the legal relationship existing between a child and his natural or adoptive parents incident to which the law confers or imposes rights, privileges, duties and obligations. It includes both the mother and child relationship and the father and child relationship and extends equally to every child and parent regardless of the marital status of the parents." (Emphasis added.)
By way of comment, it can surely be said that the putative father is one with respect to whom the law confers or imposes the
"* * * rights, privileges, duties and obligations * * *"
contemplated by this statute. To reach this conclusion, we need only to recall that § 14-2-104, W.S. 1977, supra, allows the mother, child and presumed father to establish parenthood in the biological father. Unquestionably, this imposes upon the natural father a duty or obligation as contemplated by statute ("duties and obligations"), even where, as here, the child is conceived by unwed parents but born to the mother after marriage to another man who is, therefore, the presumptive father.
Section 14-2-101(b) enumerates those capable of establishing the parent-child relationship and at subsection (ii) provides that "the natural father" is one such person.
A man who is married to a woman at a time when she bears a child is, under § 14-2-102, the presumptive father of the child. The statute says:
"(a) A man is presumed to be the natural father of a child if:
"(i) He and the child's natural mother are or have been married to each other and the child is born during the marriage. * * *."
But the presumption of fatherhood is rebuttable.
Subsection (b) provides:
"(b) A presumption under this section may be rebutted in an appropriate action only by clear and convincing evidence. If two (2) or more presumptions arise which conflict with each other, the presumption which on the facts is founded on the weightier considerations of policy and logic controls. A presumption is rebutted by a court decree establishing paternity of the child by another man."
Therefore  in my judgment at least  the presumption of fatherhood in the wife's husband is only that  a presumption  capable, as with other presumptions of being rebutted.
This leaves the question: Is the biological father one of those who may rebut the presumption?
I would answer this question in the affirmative. I would say the putative father has standing according to the following analysis.
We have a body of statutory law which says the following things: The putative father enjoys a parent-child relationship with his son. This father can assert his rights with respect to this relationship where there is no presumed father. Where there is a presumed father, says the statute the presumption of parenthood is not conclusive but is subject to rebuttal  even by the presumptive father as well as the mother and/or the child. While § 14-2-102 provides that any of the presumptions of fatherhood are subject to rebuttal, § 14-2-104 fails to give a right of action for this purpose to the natural father while furnishing such right of action to the mother, presumptive father and child.
Since the presumption is rebuttable and the putative father has an interest, i.e., a parent-child relationship interest, I would conclude that he has standing to establish his interest and permit it to work for him in whatever way the law allows.

EQUAL PROTECTION
Once the putative father is permitted to go to court, i.e. once his standing is established, the question is: What rights may he enforce?
*1231 I would hold that he can successfully attack the constitutionality of a statute which fails to give him a right of action to enforce his parent-child relationship while such statute gives this right to the mother and gives to her the further right to allege, prove and enforce the putative father's parent-child obligations  as being in violation of his rights of equal protection under the Federal and Wyoming Constitutions.
The majority opinion rejects appellant's constitutional attack when it holds that the statutory scheme is not an invidious gender-based classification and does not affect a substantial interest of the appellant so as to deny him equal protection and due process of law. With both of these conclusions I must disagree.
The statute, in my judgment, is unconstitutional because it impermissibly discriminates between natural mothers and those who assert paternity or are admitted to be the natural father in that the classification, while substantially relating to an important government interest, does not by its own terms, achieve the protection of the worthwhile purpose that it proclaims.
The statutory scheme contained in § 14-2-104 invidiously discriminates on the basis of sex in one obvious way. Under the statute the biological mother is permitted to bring an action to disrupt the family unit (consisting of the mother, presumed father and child) in order to declare paternity in another  namely, the biological father (as in a bastardy proceeding), while the biological father is prevented from doing the same, i.e., bringing suit to establish his parent-child relationship, which, perforce, would carry with it the self-same family unit disruption and bastardy ramifications.
In other words, why is it  asks the natural father  that the law permits the mother of the child born of our union to institute a suit against me which has the effect of interrupting the harmony of the family unit (which, arguendo, she enjoys with our child and the presumed father) the purpose of which suit is to prove that I am the biological father for purposes of enforcing child support and other parental obligations  thus causing the child to be exposed as a bastard  while I, the natural father, do not have standing to assert my rights of parenthood  which assertion will admittedly have the identical socially unacceptable consequence, i.e., the potential disruption of the family unit and the bastardization of the child?
The majority opinion justifies the classification described by the statute on the ground that the legislative enactment is simply recognizing an obvious difference between the sexes, which is that women bear children and give birth to them, while men do not. This biological truism does not impress me as one which the statute is designed to recognize as a reason for giving the natural mother the right to bring a paternity suit while denying this same right to the natural father. In any case, the fact that the mother bears and births the child while the father does not, is not perceived to be such a classifying incident as should preclude the mother from suing the natural father to establish the parent-child relationship. So why should it be such a gender-based classification as should preclude the putative father's suit to establish the same thing?
Even though the mother carried and gave birth to the child, this bears no significant relationship to the question which asks why she can lawfully disrupt the family unit and bastardize the child while at the same time the biological father is precluded from protecting his right to establish his parent-child relationship, with identical attendant results. To recognize a sex distinction, as in Michael v. Superior Court of Sonoma County, 450 U.S. 464, 101 S.Ct. 1200, 67 L.Ed.2d 437 (1981)[2] instead, the statute is admittedly designed to legitimize the child *1232 and encourage family unity. The method utilized to achieve this purpose is fault-ridden because the scheme permits the mother, the presumptive father or the child to transgress the statutory goals, while denying the natural father the same right. For me, such a classification is clearly invidious, and the statute would have to satisfy the proper constitutional scrutiny before I could hold it constitutional.
The proper scrutiny or standard to be utilized in determining whether or not a given classification based on sex violates the equal-protection clause has been stated on several occasions. In order to pass constitutional muster, the gender-based classification must further important governmental objectives and be substantially related to the achievement of those goals. The equal-protection review standard was described in Caban v. Mohammed, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979) as follows:

"Gender based distinctions must serve [important] governmental objectives and must be substantially related to the achievement of these objectives in order to withstand judicial scrutiny under the equal protection clause." (Emphasis added.) 441 U.S. at 388, 99 S.Ct. at 1765.
See also; Craig v. Boren, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971).
Nobody could quarrel with the governmental objectives that are identified and embraced in the majority opinion. Those objectives are said to be the protection of a state interest in legitimizing the child, the result of which is to further and strengthen the unity of family life. Such interests certainly rise to a level of important governmental objectives. R. McG. v. J.W., Colo., 615 P.2d 666, 670 (1980). The problem in this case is that we really are not permitted to judge this classification on the issue of whether or not we are pursuing a worthwhile governmental interest because the statute itself destroys its own presumed high purpose. That is  if it is the purpose of the statute that the family unit be preserved (and thus the necessity for refusing to give to the father a right of action to establish the parent-child relationship) this purpose self-destructs when, in the next breath, we permit the mother to file suit against the natural father, with the same undesirable consequence that the State relies upon to justify the classification in the first place.
The issue in this appeal is not, therefore, whether the governmental ends are worthwhile, but whether or not the means sought to attain them are faulty. It is not sufficient that the ends are of high purpose; they must be not only that  of high purpose  but the classification must also be shown to be constituted in a way to reasonably further these ends. Furthermore, the classification may not be arbitrary, must be reasonable and must be bottomed in a concept of difference which has a logical relation to the legislation's objective so that all who are similarly situated will be treated alike. Caban v. Mohammed, 441 U.S. at 391, 99 S.Ct. at 1767.
"* * * [T]he unquestioned right of the State to further these desirable ends by legislation is not in itself sufficient to justify the gender-based distinction * *. Rather, under the relevant cases applying the Equal Protection Clause it must be shown that the distinction is structured reasonably to further these ends * * * [S]uch a statutory `classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike. * * *'" Caban v. Mohammed, 441 U.S. at 391, 99 S.Ct. at 1767.
In this case, the State cannot demonstrate why the biological mother, of necessity, must be treated in a manner different from the way the biological father is treated. To allow the natural mother, according to her own whims, to bring a paternity action, even when the family unit is strong, and without a showing of some kind of necessity  financial or otherwise  is to grind into the legislative scheme a means *1233 by which the legitimate and worthwhile statutory objectives can be methodically destroyed. To further point out the inherent weaknesses of the statute, it is to be remembered that the presumed father, under § 14-2-102(a), can also, at his own whim, destroy or negate the government's goals.
In analyzing this statute with respect to an equal-protection attack, the Colorado Supreme Court in R. McG. v. J.W., supra, puts it well when it says:
"This statutory scheme creates more than a difference in treatment of natural mothers and fathers. It establishes contrary treatment. Although a statutory classification under the intermediate level of scrutiny need not be tailored precisely to the interest sought to be achieved, it must at least mesh substantially with the purpose that the statutory classification is designed to accommodate. The statutory classification and corresponding difference in treatment created by section 19-6-107(1) fail to pass constitutional muster under equal protection doctrine. Section 19-6-107(1) exemplifies a gender-based classification predicated on an overbroad generalization that a mother has a legitimate interest in establishing a determination of paternity in a non-spousal father, while such father has no interest in establishing a determination of paternity in himself. See, e.g., Caban v. Mohammed, supra; Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); cf. Quilloin v. Walcott, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978) (unwed father, who never sought custody of eleven-year-old minor child, was granted full hearing on his interest in child, but his interest cannot prevent child's adoption by natural mother's husband). Under the circumstances present here, the claiming natural father, no less than the mother, must have the right to establish the significant relationship of paternity as to the child he has allegedly sired." Id. at 671.
Therefore, the classification is not substantially related to the achievement of important and valid governmental objectives, and, as to the putative father, results in a denial of equal protection of the law.

DUE PROCESS
I also believe that the failure of § 14-2-104 to grant the putative father standing to establish his paternity denies him due process of law. The majority opinion concludes that the biological father is not denied due process because he fails to demonstrate any fundamental interest which is infringed upon, or which would require some form of hearing. I disagree with this conclusion because it flies directly in the face of Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). In Stanley v. Illinois, the United States Supreme Court said:
"The private interest here, that of a man in the children he has sired and raised, undeniably warrants deference and, absent a powerful countervailing interest, protection. It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children `come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements.' Kovacs v. Cooper, 336 U.S. 77, 95, 69 S.Ct. 448, 458, 93 L.Ed. 513 (1949) (Frankfurter, J., concurring).
"The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed `essential,' Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923), `basic civil rights of man,' Skinner v. Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942), and `[r]ights far more precious ... than property rights,' May v. Anderson, 345 U.S. 528, 533, 73 S.Ct. 840, 843, 97 L.Ed. 1221 (1953). `It is cardinal with us that custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.' Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944). The integrity of the family unit has found protection *1234 in the Due Process Clause of the Fourteenth Amendment, Meyer v. Nebraska, supra, 262 U.S. at 399, 43 S.Ct. at 626, the Equal Protection Clause of the Fourteenth Amendment, Skinner v. Oklahoma, supra, 316 U.S., at 541, 62 S.Ct., at 1113, and the Ninth Amendment. Griswold v. Connecticut, 381 U.S. 479, 496, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring).
"Nor has the law refused to recognize those family relationships unlegitimized by a marriage ceremony. The Court has declared unconstitutional a state statute denying natural, but illegitimate, children a wrongful-death action for the death of their mother, emphasizing that such children cannot be denied the right of other children because familial bonds in such cases were often as warm, enduring, and important as those arising within a more formally organized family unit. Levy v. Louisiana, 391 U.S. 68, 71-72, 88 S.Ct. 1509, 1511, 20 L.Ed.2d 436 (1968). `To say that the test of equal protection should be the "legal" rather than the biological relationship is to avoid the issue. For the Equal Protection Clause necessarily limits the authority of a State to draw such "legal" lines as it chooses.' Glona v. American Guarantee & Liability Ins. Co., 391 U.S. 73, 75-76, 88 S.Ct. 1515, 1516, 20 L.Ed.2d 441 (1968).
"These authorities make it clear that, at the least, Stanley's interest in retaining custody of his children is cognizable and substantial." Stanley v. Illinois, supra, 405 U.S. at 651-652, 92 S.Ct. at 1212-13.
We embraced the Stanley doctrine in DS v. Dept. of Public Assistance & Social Services, supra, 607 P.2d at 918, where we said:
"In addition, we are helped in our task by a large body of state and federal constitutional law defining the interests individuals have in their family associations. The right to associate with one's immediate family is a fundamental liberty protected by the state and federal constitutions. Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (integrity of the family unit protected by the due-process clause of the Fourteenth Amendment); and Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (implication that liberties guaranteed by the federal constitution are fundamental). See, also, State ex rel. Heller v. Miller, 61 Ohio St.2d 6, 399 N.E.2d 66 (1980). Analysis of the Wyoming Constitution and case law also leads to the conclusion that the right to associate with one's family is a fundamental liberty. Article 1, Sections 2, 6, 7 and 36, Wyoming Constitution; Washakie County School District Number One v. Herschler, Wyo., 606 P.2d 310 (1980); Matter of Adoption of Voss, Wyo., 550 P.2d 481 (1976); and In re Adoption of Strauser, 65 Wyo. 98, 196 P.2d 862 (1948)."
See also Blair v. Supreme Court of the State of Wyoming, supra.
It is well established, therefore, that the putative father has a constitutionally protected right to participate in the support, maintenance and upbringing of his minor child. It is an interest that the state cannot ignore. In my judgment, it is also one that I believe the state cannot take away without providing the putative father with a hearing. As noted earlier, the statute is designed to achieve important governmental objectives. However, here § 14-2-104 attempts to ignore the biological father's constitutional rights to establish a relationship with the child he has sired. In my mind, the scheme is a blatant denial of due process because the presumption of fatherhood in the mother's husband operates to prohibit the natural father from establishing the parent-child relationship.[3] In my *1235 judgment, the putative father cannot constitutionally be precluded from establishing the father-child relationship without the state at least affording him a right to be heard. Arguably, under Quilloin v. Walcott, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978), the court could deny the putative father the right to pursue his parental rights under his established relationship for the reason that it would not be in the child's best interests, but this result could only be reached after the putative father is provided with a hearing on the matter. Since § 14-2-104 fails to provide for such a procedure it is a denial of the biological father's rights of due process.
Finally, I cannot adopt the position taken by Justice Thomas in his concurring opinion, since he would only give standing to a biological father who arguably would not desire to establish the father-child relationship in the first place.
I would have reversed.
NOTES
[1] Section 1 of the Fourteenth Amendment of the United States Constitution provides in pertinent part: "* * * nor shall any State deprive any person of life, liberty or property without due process of law; nor deny to any person * * * the equal protection of the laws." Art. 1, § 2 of the Wyoming Constitution provides: "In their inherent right to life, liberty and the pursuit of happiness, all members of the human race are equal." Art. 1, § 6 of the Wyoming Constitution provides: "No person shall be deprived of life, liberty or property without due process of law."
[2] Appellees also refer to legislative intent as a basis for their position. They point to the fact that § 14-2-101, W.S. 1977 et seq., was modeled after the Uniform Parentage Act, but that the following section of the uniform act was omitted from the Wyoming enactment as one of the instances in which a man is presumed to be the natural father of a child:

"(5) he acknowledges his paternity of the child in a writing filed with the [appropriate court or Vital Statistics Bureau], which shall promptly inform the mother of the filing of the acknowledgment, and she does not dispute the acknowledgment within a reasonable time after being informed thereof, in a writing filed with the [appropriate court or Vital Statistics Bureau]. If another man is presumed under this section to be the child's father, acknowledgment may be effected only with the written consent of the presumed father or after the presumption has been rebutted." 9A U.L.A. Matrimonial, Family & Health Laws, Parentage Act, § 4, p. 591 (1979).
Appellees argue that the deliberate omission of such from the Wyoming act evidences an intent to deny such entitlement to a biological father since the language gives such entitlement to him. However the language would not do so in this case. Other states in which the language was not omitted in the adopted legislation interpret the language to afford such entitlement only after the presumption of paternity in another has been rebutted. See, e.g., R. McG. v. J.W., Colo., 615 P.2d 666 at 669 (1980).
[1] Justice Brown told us in Panhandle Eastern Pipe Line Company v. Smith, Wyo., 637 P.2d 1020, 1023, n. 3 (1981) what "Catch-22" meant when he said:

"In the novel Catch-22, Group Headquarters let its men request a medical release if they thought they were on the verge of a nervous collapse. When Yossarian, a bombardier, asked the doctor for a release, the doctor refused. He told Yossarian the catch was that his recommendation for a release had to be approved by Group, and Group never approved any of them. The doctor later said to Yossarian that Group couldn't let the crazy people go home, as no one else but a crazy person would fly the bombing missions willingly. J. Heller, Catch-22, Simon and Schuster (1955, 1961)."
[2] In Michael v. Superior Court of Sonoma County, supra, the Supreme Court of the United States, in a plurality opinion, upheld the California statutory rape statute which allowed only men to be prosecuted because a purpose of the statute was to recognize that only minor females could become pregnant as a result of the illegal sexual act. A primary purpose of the statute was considered to be the reduction of teenage pregnancy.
[3] In Stanley v. Illinois, supra, Caban v. Mohammed, supra, and Quilloin v. Walcott, infra, the Supreme Court of the United States placed some significance on the fact that the challenging party had previously established some parent-child relationship. Such factors, however, merely served to further tip the scales in the balancing process in favor of the natural father's right to due process. Here, the legislative scheme, in my mind, is a stronger denial of due process because the state attempts to reject the natural father's rights without giving him the opportunity to ever establish them.